BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
                                   .   Case Number 18-CR-04
          Plaintiff,               .
                                   .
     vs.                           .
                                   .   Washington, D.C.
JASON TODD THOMAS,                 .   July 25, 2018
                                   .   2:05 p.m.
          Defendant.               .
- - - - - - - - - - - - - - - - - -


TRANSCRIPT EXCERPT OF MOTION HEARING
BEFORE THE HONORABLE DABNEY L. FRIEDRICH
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:          SARA VANORE, AUSA
                             United States Attorney's Office
                             555 Fourth Street Northwest
                             Washington, D.C. 20530
                             202-252-7566

For the Defendant:           A.J. KRAMER, FPD
                             CELIA GOETZL, AFPD
                             Federal Public Defender's Office
                             625 Indiana Avenue Northwest
                             Suite 550
                             Washington, D.C. 20004
                             202-208-7500



Official Court Reporter:     SARA A. WICK, RPR, CRR
                             U.S. Courthouse, Room 4704-B
                             333 Constitution Avenue Northwest
                             Washington, D.C. 20001
                             202-354-3284


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

C O N T E N T S

|                          | Direct | Cross | Redirect | Recross | Further Redirect |
|--------------------------|--------|-------|----------|---------|------------------|
| WITNESSES FOR THE GOVERNMENT |    |       |          |         |                  |
| MICHAEL PEREZ            | 5      | 37    | 68       |         |                  |
| JOSEPH PRENDERGAST       | 79     | 83    |          |         |                  |
| WITNESSES FOR THE DEFENDANT |     |       |          |         |                  |
| RACHEL BEE               | 90     |       |          |         |                  |
| JASON THOMAS             | 94     | 95    | 105      |         |                  |

P R O C E E D I N G S

(Call to order of the court.)

THE COURTROOM DEPUTY:  Your Honor, this is Criminal Case Number 18-04, *United States of America versus Jason Todd Thomas*.  The defendant is present.

Will counsel, please, approach the podium and identify yourselves for the record, as well as any additional parties at your table.

MS. VANORE:  Good afternoon, your Honor.  Sara Vanore for the United States.

Your Honor, in the gallery, I have an intern from my office this summer.  His name is Conner Reuben.  He just completed his first year at Michigan Law School.  Would your Honor mind if he sat at the table for the hearing?

THE COURT:  Not at all.  Any objection?

MR. KRAMER:  I didn't have any until I heard he was from Michigan.  It is fine, Your Honor, obviously.

Your Honor, A.J. Kramer and Celia Goetzl on behalf of Mr. Thomas, who is present.

THE COURT:  Good afternoon, Mr. Kramer.

Before the Court is defendant's motion to suppress evidence and statements.  Are both parties prepared to go forward?

MR. KRAMER:  I should add, your Honor, we sent an e-mail last night to the government, telling them that they didn't have to bring the officer who took the statements because

we were withdrawing the Miranda part of that, as well as the voluntariness, and only proceeding on the poisonous tree, which is just the legal issues.

THE COURT:  Very helpful.

MR. KRAMER:  So we told them that they didn't need to bring the police officer --

THE COURT:  The detective?

MR. KRAMER:  -- who took the statements, right, as it was only going to be -- if they didn't want to, obviously.  But we weren't going to --

THE COURT:  You're not going to challenge the Mirandized statement?

MR. KRAMER:  Any factual issues about it, right.

THE COURT:  So are both parties prepared to go forward?

MS. VANORE:  We are prepared, your Honor.  And I did receive that e-mail, although Detective Wilkinson is still here, so should any issues arise as to that.

THE COURT:  How many witnesses do you expect calling today?

MS. VANORE:  I expect to call two, your Honor:  The first, Officer Perez, who I expect will be the lengthiest witness, and then Officer Prendergast, who should be pretty short.

THE COURT:  These were the two officers who were at

the scene of the stop?

MS. VANORE:  That's correct, your Honor.

THE COURT:  Okay.  How about the defense?  Do you expect to call any witnesses?

MR. KRAMER:  Two, your Honor:  Mr. Thomas and an investigator from our office.  I think both of ours will be very brief.

THE COURT:  All right.  Ms. Vanore, you may call your first witness.

MICHAEL PEREZ, WITNESS FOR THE GOVERNMENT, SWORN

MS. VANORE:  May I proceed, your Honor?

THE COURT:  Yes.

DIRECT EXAMINATION

BY MS. VANORE:

Q.  Good afternoon, Officer Perez.

A.  Good afternoon.

Q.  Could you, please, state and spell your name for the record.

A.  Yes.  Michael Perez, M-i-c-h-a-e-l P-e-r-e-z.

Q.  And how are you employed?

A.  Metropolitan Police.

Q.  How long have you been with the Metropolitan Police Department?

A.  Three and a half years now.

Q.  What district are you assigned to?

A.    First District.

Q.    Have you always been assigned to the First District?

A.    Yes.

Q.    Are you with any particular unit within that district?

A.    Robbery and burglary tac.

Q.    What part of the city is 1D?

A.    We are around the Eastern Market area.

Q.    And do you have any prior law enforcement experience or anything other than your time on MPD?

A.    No.

Q.    Did you participate in the arrest of an individual named Jason Todd Thomas for illegal possession of a firearm on September 7th of 2017?

A.    Yes.

Q.    Okay.  What was your tour of duty on that day?

A.    Evening tour of duty.

Q.    What hours of is that, approximately, if you remember?

A.    I would -- I don't really recall exactly what the hours were, but I would say starting at 1:00 to 3:00, in between that time, and ending early in the morning.

Q.    Early in the morning would be like 1:00 or 2:00 in the morning?

A.    Correct.

Q.    Were you working on your own that day, or were you with partners?

A.    I had a partner.

Q.    Who was that?

A.    Joe Prendergast.

Q.    Were you all on foot or a bike or a vehicle, or how were you moving around?

A.    We were in a vehicle.

Q.    And were you wearing a police uniform like the one you are wearing today?

A.    Yes.

Q.    Was Officer Prendergast as well?

A.    Yes.

Q.    Around 5:30 in the evening, were you in the area of the 1700 block of Benning Road in northeast?

A.    Yes.

Q.    Is that location in Washington, D.C.?

A.    Yes.

Q.    Is that in the First District?

A.    No.

Q.    What district is that in?

A.    The Fifth District.

Q.    Is that close to your district?

A.    Yes, a couple blocks.

Q.    And around that time, did you see anything that caught your attention while you were in your vehicle?

A.    Yes.

Q.   And were you the driver or passenger of that vehicle, of your police vehicle?

A.   I was the passenger.

Q.   Was Officer Prendergast driving?

A.   Yes.

Q.   And it was just the two of you in that vehicle?

A.   Yes.

Q.   Was Officer Prendergast in a uniform as well?

A.   Yes.

Q.   Had you gone to the 1700 block of Benning Road Northeast for any particular reason, or were you just on kind of a regular patrol there?

A.   We were on patrol, and we were pulling a traffic stop on a vehicle.

Q.   What was it that caught your attention that led to that traffic stop?

A.   The vehicle -- the tag was not registered in the state of Virginia.

Q.   What kind of a vehicle was it that you were pulling over?

A.   A yellow Hummer.

Q.   How did you know that the tag wasn't registered in the state of Virginia?

A.   We ran it through the system, and it came back not registered or not on file.

Q.   Were you driving behind it, then?

A.    Yes.

Q.    Was there any particular reason why you ran that tag, or is that just something you do?

A.    We just run tags.

Q.    Okay.  And when it says it's not on file in the state of Virginia, what does that mean?

A.    That it was not registered to anybody at that time.

Q.    Okay.  And you're talking about the number on the plate specifically itself?

A.    Correct.

Q.    Okay.  And so how did you conduct the traffic stop?

A.    We activated our lights and sirens and our body cameras and pulled him over in the 1700 block.

Q.    Did the vehicle pull over pretty much right away?

A.    Yeah.

Q.    Had you ever pulled over that vehicle before?

A.    No.

Q.    Had you ever seen that vehicle before this time?

A.    No.

Q.    When you pulled the vehicle over, how many people were in the vehicle?

A.    Just one.

Q.    Was that person, I assume, in the driver's seat?

A.    Yes.

Q.    Do you see the person that was in the driver's seat in

court today?

A.    I do.

Q.    Could you, please, identify him?

A.    Yeah, the gentleman over there --

MR. KRAMER:  Your Honor, we will stipulate that it is Mr. Thomas.

THE COURT:  Thank you.

MS. VANORE:  If the Court could reflect identification.

THE COURT:  Yes.

BY MS. VANORE:

Q.    And when you first approached the vehicle, which side of the vehicle did you approach?

A.    On the passenger side.

Q.    And what happened -- did your partner also approach the vehicle?

A.    He approached on the driver's side.

Q.    What happened when you all approached the vehicle?

A.    We spoke with the driver and asked him for his license, registration, and insurance.

Q.    Was he able to provide -- I'm going to go through the three of those.  Did he provide you with a license?

A.    He provided us a license, but it wasn't his.

Q.    Did he provide you with registration?

A.    No.

Q.    Did he provide you with insurance?

A.    No.

Q.    Okay.  Let's start with the license.  You said he provided you with a license, but it wasn't his.  Tell us how you knew that or how you figured that out.

A.    The picture on the ID, on the license didn't look like him at all, and it had somebody else's name on it.

Q.    Okay.  So what did you do?

A.    We ran it through the system and tried to investigate it more, and we found a picture of him in our system with his real name as Mr. Thomas.

Q.    Okay.  And did you or your partner eventually confront the defendant with this information?

A.    We did.

THE COURT:  Wait.  How did you find him in your system?

THE WITNESS:  He was in our Cobalt system, and it has picture IDs.

THE COURT:  He was tied to the vehicle?

THE WITNESS:  It was probably -- I don't think it was to that vehicle, but he was giving us the false information, false name.  So with the picture that we had in our system, it looked exactly like him, and the picture on the ID did not look like him.

THE COURT:  I'm confused how had you tied the picture

in your system to him.  I understand once it was up that it looked like him, but how did you pull it up?

THE WITNESS:  Oh, he provided -- he said his boss's name was Mr. Thomas, Jason Todd Thomas, on the traffic stop.  He said that that was him, the person on the card.

THE COURT:  So you looked for Mr. Thomas?

THE WITNESS:  Correct, to see who was his boss, so we could give him a call and ask him what's actually going on, and it turned out it was him.

THE COURT:  Had you seen the Hummer earlier in the day?

THE WITNESS:  No, that was the first time.

BY MS. VANORE:

Q.   So the license that he gave you was in a different name; right?

A.   Correct.

Q.   And then he gave you the name of Jason Thomas as being his boss?

A.   Yeah.

Q.   Why did he give you his boss's name?

A.   I don't know why he would give his boss's name like that.

Q.   Okay.  But that's what led you to look up the name of Jason Todd Thomas?

A.   Correct.

Q.   Then what did you figure out after you looked that up?

A.   That he was, in fact, Mr. Jason Todd Thomas.

Q.   Okay.  And did you or your partner ask him about this or confront him with this information?

A.   We did.

Q.   And did he admit eventually to being Jason Todd Thomas?

A.   Eventually, he did, yes.

Q.   Was Jason Todd Thomas, the defendant, the owner of that Hummer?

A.   I believe so, yes.

Q.   Was he ever able to provide you with a valid driver's license for himself?

A.   No.

Q.   Was he ever able to provide you with a valid registration for that vehicle?

A.   No.

Q.   And did he ever provide you with a valid insurance card for that vehicle?

A.   No.

Q.   And are those all -- to your knowledge, as a Metropolitan Police Department officer, are those all violations of local D.C. law?

A.   Yes.

Q.   And so you do have to have an insured registered vehicle and have a valid driver's license to drive in the District of Columbia; correct?

A.   Yes.

Q.   And have you issued traffic infractions for those sorts of incidents before?

A.   Yes.

Q.   Okay.  Officer, were you and your partner wearing body-worn cameras when you conducted this traffic stop?

A.   Yes.

Q.   Okay.  I'm going to approach you now, and I will show counsel, with what I've marked as Government's Exhibit 1.

     (Counsel approached witness.)

Q.   Do you recognize this?

A.   Yes.

Q.   And what is it?

A.   That's my body camera video.

Q.   Is that your signature on the disk there?

A.   It is.

Q.   And did you have a chance to view this prior to testifying today?

A.   Yes.

Q.   And does this fairly and accurately show what happened that day as far as what your camera picks up?

A.   Yes.

         MS. VANORE:  Your Honor, at this time -- and I've provided the Court and counsel have seen this prior, but I would move Government's Exhibit 1 into evidence.

THE COURT:  Any objection?

MR. KRAMER:  No.

THE COURT:  It's admitted.

(Government Exhibit 1 received into evidence.)

MS. VANORE:  I'd just ask for a minute to load it.

BY MS. VANORE:

Q.   Can you see it on the screen in front of you?

A.   Yes, I can.

Q.   So we are at the very beginning of your body-worn camera footage, the one on Government's Exhibit 1 marked as "Perez 1," which shows the traffic stop.

Is this you in the vehicle here at the beginning?

A.   Yes.

Q.   Okay.  And there's no sound in the beginning of these videos; is that right?

A.   No, there's not.

Q.   So I'm going to fast forward to about 1 minute 8 on the video, and I will pause it, and let me turn it down a bit.  Here at about 1 minute, I'm going to start it again.

(Video played.)

Q.   I'm stopped here at 1:21.  Is this the yellow Hummer that you pulled over?

A.   Yes.

Q.   And all the way to the left side of the screen, who is that we see there?

A.    That's my partner.

Q.    Okay.

      (Video played.)

Q.    I'm going to stop there at about 2:22.  Was that your initial interaction with the defendant?

A.    Yes.

Q.    Did your partner explain to the defendant why he had been pulled over?

A.    I believe so.

Q.    And did you all ask -- is that then when you asked for the license and registration?

A.    That's when I believe he asked for it.

Q.    Okay.  And after that, did you then try to figure out if that was his actual license?

A.    Yes.

Q.    Okay.  And did there come a time when you actually went to talk to the defendant while he was in the vehicle?

A.    Yes.

Q.    Okay.  So I'm going to -- we are stopped at 2:22.  I'm going to move the footage up to about 6:30.  And I'm looking at the time stamp on the bottom, which is not the time of day but just how far into the video we are.

      (Video played.)

Q.    So I'm stopping here at about 7:21.  First of all, did you ask the defendant to get out of the vehicle there, or did he get

out?

A.    He got out.

Q.    And what is this piece of paper you are holding here that he's handed you?

A.    I believe it's a temporary tag, registration that didn't belong to that tag at all.

Q.    And is that what was in the name of Jason Thomas?

A.    Yes.

Q.    So that's how you got that name?

A.    Yeah.

Q.    Okay.  And at this point, he tells you that that's him; correct?

A.    Not at this point.  Later on, we find out that it was --

Q.    I'm sorry.  At this point -- what I meant to say is that he tells you that's his boss; correct?

A.    That's his boss, yes.

Q.    I'm going to restart it here at 7:21.

      (Video played.)

Q.    I'm going to pause right here.  I'm at 8:09.  The first thing I want to ask is, based on that portion we just saw, was this -- even this temporary registration that he gave you, was this valid?

A.    No, it was expired.

Q.    And then what just happened in the interaction that we just saw before I stopped the video?

A.   He just gave us verbal consent.  He said, "You can check me; you can check it."

Q.   Had you asked him for consent prior to that?

A.   No.

Q.   When he said "check me, check it," did he do --

MR. KRAMER:  Objection, your Honor.  That misstates what he just testified to.

THE COURT:  Yeah, ask the question again.

MS. VANORE:  Sure.

BY MS. VANORE:

Q.   What did he say there?

A.   "You can check me; you can check it."  "You can check me, check it."

Q.   Okay.  What did you take that to mean?

A.   That we can search the car and search him.

Q.   Why did you take it to mean that?

A.   That's what I thought he was implying.  He said he was good, we can check him, we can check the car.

Q.   And you all are standing pretty close to the car; is that fair to say?

A.   Yes.

Q.   Okay.  Was there anything else -- because the word that you used was "it."  Was there anything else, like, did he have a bag or anything else that might have been checked?

A.   No.  I believe he was referring to the car.

Q.    Okay.

THE COURT:  Officer Perez, what did you say to the defendant when he said that?

THE WITNESS:  I believe I said, "Okay.  I'm just trying to focus on the registration right now."

THE COURT:  You said "okay"?

THE WITNESS:  I mean, I don't remember exactly how I responded, but I was trying to figure out the registration for that vehicle at that time.  I hadn't even come to that point of asking him for consent.

BY MS. VANORE:

Q.    Okay.  I will start it again.  I will actually back it up just a little bit, and we can see how you respond in the tape.

I've backed it up to 7:51.

(Video played.)

Q.    I'm going to stop it here at 8:30.  At this point -- you've watched the whole video; correct?

A.    Yes.

Q.    We've entered the whole video into evidence.  Is there any point where he's able to give you a valid registration?

A.    No.

Q.    Is there any point where he gives you valid insurance?

A.    No.

Q.    Is there any point where he gives you a valid driver's license that's actually his?

A.   No.

Q.   And once you determine that he actually is Jason Todd Thomas, what do you find out about Jason Todd Thomas?

A.   That he had an outstanding warrant.

Q.   Do you recall what that was for?

A.   Failure to appear on a -- I believe a no permit arrest.

Q.   And once you found that valid arrest warrant, what did you do?

A.   We placed him in handcuffs.

Q.   Okay.  After you placed him in handcuffs, was there a conversation about what to do with the vehicle?

A.   Yes.

Q.   Okay.  Because here -- what we're seeing on the video here, are you guys in a valid -- either your car or the Hummer, are you in a valid parking area?

A.   No, I don't believe so.

Q.   Is that just, like, a travel lane on Benning Road?

A.   Yes.

Q.   Okay.  So I'm going to move -- and when that situation happens, when the person can't drive the vehicle back, what do you typically do with a vehicle that's not in a valid parking spot?

A.   We usually move it for them or bring it back to the station or tow it.

Q.   Okay.  So I'm going to go to -- again, I'm looking at the

bottom.  I'm going to go to 16 minutes on the video.

(Video played.)

Q.    I'm going to stop here at 17:58.  So what happened during that exchange between the defendant and the two of you?

A.    He wanted us to bring his car back to the station.  He didn't want us to park it around the corner or leave it there.

Q.    Okay.  And then we see Officer Prendergast go in the vehicle and check that the keys are in the ignition and get some items out of the vehicle; is that right?

MR. KRAMER:  Objection; leading.

THE COURT:  Rephrase it.

MS. VANORE:  Sure.

BY MS. VANORE:

Q.    What does Officer Prendergast do after you decide -- after the three of you decide what to do with the vehicle?

A.    He checked if the keys were still in the vehicle, and he got him a cigarette.

Q.    And I see -- where we're stopped right here, you have something in what I believe is an evidence bag.  What is that?

A.    That's all the property that we were taking off of him.

Q.    Did Officer Prendergast get anything out of the vehicle?

A.    Other than the cigarette, I don't believe so.

Q.    Did the defendant at this point make -- have any objections to Officer Prendergast going in and out of the vehicle like that that he voiced to you or to Officer Prendergast?

A.    No.

Q.    All right.  And then I'm going to fast forward a little more, to 20 minutes into the tape.

(Video played.)

Q.    All right.  Who do we see still standing here in the video?  I'm at 20:08.

A.    Mr. Thomas and my partner.

Q.    And what are you about to do here, if you know?

A.    I believe I'm about to search the car.

(Video played.)

Q.    I'm pausing here at 20:21.  As you've opened the driver's door here and you're going through some receipts and things, is Mr. Thomas still standing on the sidewalk?

A.    Yes.

Q.    And to your knowledge, does he say anything, asking you to stop or telling you that you can't search the vehicle?

A.    No.

Q.    Okay.

(Video played.)

Q.    I'm going to stop there at around 21:00.  Had you or your partner at this point called for someone to transport Mr. Thomas?

A.    Yes.

Q.    So you were not going to transport him yourself to the station; correct?

A.    No.

Q.    Does he eventually get picked up?

A.    Yes.

Q.    But he is still there for at least part of the time you are searching the vehicle on scene; correct?

A.    Yes.

Q.    Did you complete searching the vehicle on scene?

A.    No.

Q.    Why not?

A.    The location where we were at with the traffic, people walking around, it just wasn't safe.

Q.    So what did you do?

A.    We drove the car back to the station and then continued the search at the station, in a closed environment.

THE COURT:  So you were still searching when Mr. Thomas was taken away?

THE WITNESS:  Yes.  I didn't actually see him walk away.  When -- the last I saw him, he was standing at that passenger window.

BY MS. VANORE:

Q.    I will move the video -- so we were at 26:00.  I will move to the end of the video.

(Video played.)

BY MS. VANORE:

Q.    So we are at 26:25, and you are talking to your partner.

Is Mr. Thomas there any longer?

A.   I don't believe he is there.

Q.   Okay.  And I've moved to 27 minutes.

     (Video played.)

Q.   That's where your video ends at that point?

A.   Yes.

Q.   At some point between when you started searching the vehicle and when you decided to take it back to the station, Mr. Thomas was picked up?

A.   Yes.

Q.   When you took it back to the station -- I'm sorry.

     At any point before he was transported, did he say anything to you about not giving his consent to search the car or that you shouldn't be searching the car?

A.   No.

Q.   Did he ever change his mind or indicate in any way to you that he no longer wanted you to drive the car back to the police station?

A.   No.

Q.   And so did you or your partner drive the car back to the police station?

A.   My partner did.

Q.   About how long did it take from wherever you were to the police station?

A.   With traffic, depending -- I mean, you could say roughly

20, 30 minutes.

Q.   Did you begin to search the vehicle immediately after you got back to the station?

A.   Yes.

Q.   So that was -- would I be fair in saying it was probably about an hour, maybe a little more, a little less, after you had had the -- after the traffic stop had happened that you searched the car at the station?

A.   Yes.

Q.   And when you searched the car at the station, was the defendant present?

A.   No.

Q.   Where was he?

A.   In the cell block.

Q.   Okay.  And that was to be processed for the warrant; correct?

A.   Correct.

Q.   All right.  And now I'm going to pull up, still in Government's 1, what's marked as "Perez 2," which is a second body camera video from you.

     Do you recognize this?

A.   Yes.

     (Video played.)

Q.   I'm going to stop right here.  We're at 0:03.  In the bottom left-hand corner, what is this you're holding in your

hand?

A.    A ticket writer.

Q.    What is a ticket writer?

A.    It's an electronic ticket writer that I could use to issue traffic citations.

Q.    Why did you have it out at this time?

A.    I was going to bring it in to issue Mr. Thomas traffic tickets.

Q.    What tickets were you going to issue to him?

A.    The insurance, not having the insurance and unregistered vehicle.

Q.    All right.  I'm going to move up to about 1:30 in this video.

      (Video played.)

Q.    Officer, what are you doing here?  I'm at 1:36.

A.    I'm taking the vehicle tag off.

Q.    Why are you doing that?

A.    We are taking it as evidence.

Q.    Evidence for what?

A.    Of the misuse of tags charge.

      MS. VANORE:  Court's indulgence.

           BY MS. VANORE:

Q.    Officer, when you were searching this vehicle, what were you looking for?

A.    We were looking for the proper tags, the registration, his

driver's license, insurance cards for the vehicle.

Q.    Had he been able to find any of those things on scene?

A.    No.

Q.    And you were intending on issuing tickets for those things?

A.    If I didn't find it.  I was trying to give him the benefit.

THE COURT:  You were aware at that point that there were special compartments in the car, weren't you?

MR. KRAMER:  I'm sorry.  I couldn't hear you.

THE COURT:  So he was aware that there were special compartments in the car at that point?  Correct?

THE WITNESS:  Like glove compartment, center console?  Is that what you're referring to?

THE COURT:  No, I'm referring to the way that the center console had been changed, that your partner pointed out.

THE WITNESS:  Oh, it lifted out, yeah.

THE COURT:  Prior to the search?

THE WITNESS:  Yes.

BY MS. VANORE:

Q.    I'm sorry.  Had you finished your answer as far as what you were looking for?

A.    Yes.

Q.    I'm going to move this video up to about six minutes in.

(Video played.)

Q.    I'm going to stop at 6:19.  Who are you talking to here?

A.    I believe another officer who just walked up.

Q.   So someone who hadn't been on the scene with you; correct?

A.   No.

     (Video played.)

Q.   I'm stopped at 6:33.  What did you just say there?

A.   "He gave us consent to search."

Q.   And you were saying that to whom?

A.   The other officer that just walked up.

Q.   The one who wasn't with you before?

A.   Yep.

Q.   And so that was your belief at that time, that you had consent to search?

A.   Yes.

Q.   Was this before the firearm was located?

A.   Yes.

Q.   Had anything incriminating been found at this point?

A.   No.

Q.   And now I'm going to move up to about 9 minutes and 30 seconds into the video.

     (Video played.)

Q.   I'm at about 10:02.  What is happening here?

A.   Officer Prendergast, he found the other tag that belonged with the set of tags.

Q.   Okay.  And you said that was one of the things you were looking for; correct?

A.   Yes.

Q.    Was this tag valid or registered?

A.    No.

Q.    When you say as a part of the other set, was it the same --
if you know, was it the same as the one on the back?

A.    It was the same tag.  That was the front tag that was not
attached to the front of the vehicle.

Q.    Now I'm going to move up to about 13 minutes into this
video.

        (Video played.)

Q.    I'm sorry.  Who is this you are speaking with here?

A.    Another officer that just rode up on his bicycle.

Q.    Okay.  And what did he ask you?  I'll back it up.  I'm
going to back it up to 13:14.

        (Video played.)

Q.    And so what does that other officer ask you?

A.    He asked if he let us drive it back.

Q.    And how did you respond?

A.    I said yeah.

Q.    Okay.  And again, this is before the firearm is found;
correct?

A.    Yes.

Q.    And that other officer wasn't on scene with you?

A.    No.

Q.    I'm going to start up again here at 13:30.

        (Video played.)

Q.   I'm stopped here at 14:30.  This is Officer Prendergast's arm that we see at this time; correct?

A.   Yes.

Q.   What did he just say?

A.   "711."

Q.   What does that mean?

A.   Just a term that we use to indicate that there's a firearm present.

(Video played.)

Q.   I'm going to stop here.  I'm at 14:54.  Where had Officer Prendergast found the firearm?

A.   Next to the sun roof, in between the sliding panel of the sun roof and the sun roof glass.

Q.   Was it just sitting there on its own?

A.   It was in a bag.

Q.   And is that what you're going to look at right now?  I'm at 14:54.

A.   Yes.

(Video played.)

Q.   I'm stopped at 15:04.  What do we see here?

A.   That's the bag that the firearm was in.

Q.   I'm going to start it again right there.

(Video played.)

Q.   I'm stopped at 15:14, but I'm going to back it up just a little bit, to 15:10.

(Video played.)

Q.   What do we see here?  I'm stopped at 15:13.

A.   You can see the firearm inside the bag at the top part of the screen there.

Q.   That's kind of in the top middle there?

A.   Yeah.

Q.   Is that that gray -- kind of gray and black stripe we see?

A.   Yes.

Q.   That's where the firearm was when you first saw it?

A.   Yes.

Q.   And to your understanding, Officer Prendergast had pulled that from the sun roof area?

A.   Yes.

(Video played.)

Q.   All right.  I'm going to stop at 15:20 and move up to 18 minutes into this video.

(Video played.)

Q.   I'm going to stop here.  Who is the individual we see walking up all the way on the right-hand side of the screen?

A.   That's our sergeant.

Q.   So that's your superior officer?

A.   Yes.

Q.   And does he get called when a gun's recovered like this?

A.   He usually comes down and asks what happened and to talk about details.

Q.    I will start it up again.

      (Video played.)

Q.    I'm stopped at 18:29.  What did you just say there?

A.    We said he gave us consent to search the car.

Q.    Was that you -- if you know, was that you, Officer
Prendergast, or both of you that said that?

A.    I believe we both said it.

Q.    And so that's how you reported this to your sergeant after
it happened?

A.    Yes.

Q.    I'm at 18:29.  I'm going to stop that video there, and I
won't be showing at this point any more from Government's 1.  So
I'm going to X that out.

      So Officer Perez, again, how long have you been a police
officer?

A.    Three and a half years.

Q.    And have you conducted searches of vehicles before?

A.    Yes.

Q.    Have you conducted searches of vehicles or of anything
pursuant to consent before?

A.    Yes.

Q.    Is there a -- did you obtain written consent in this case?

A.    No.

Q.    Why not?

A.    We were on the street at the time, and now that we have

body camera, we just usually do verbal consent on body cameras.

Q.   And is it required that you get written consent?

A.   No.

Q.   Did you at any time ask the defendant specifically for consent?

A.   No.

Q.   Okay.  But you've said that when he said "check me; check it," that's what you assumed that he meant when you were standing next to the vehicle?

A.   Yes.

Q.   Did you respond to that statement at that time?

A.   What time?

Q.   Did you respond -- did you say anything to him about consent at that time when he made that statement?

A.   No, I didn't ask or say anything about consent.

Q.   Were you the only one there at the time?

A.   Yes.

Q.   What did you later tell Officer Prendergast about that incident?

A.   That he gave us consent to search the car.

Q.   And so is that why you and Officer Prendergast searched the vehicle at the station?

A.   Yes.

Q.   And actually, you searched it a little bit on the scene as well; correct?

A.    Yes.

Q.    And Mr. Thomas -- was Mr. Thomas there for at least a part of that search?

A.    Part of it, yes.

Q.    Was there ever any time where he revoked or otherwise modified his consent?

A.    No.

Q.    Was there ever any time when he limited that consent to a particular portion of the vehicle, for instance saying, you know, don't go in the trunk or don't go in this part or anything like that?

A.    No.

Q.    So did you believe the consent was for the entire vehicle?

A.    Yes.

Q.    Was there any reason, in addition to the consent that he gave you, why you searched that vehicle?

A.    To find the documents that we were still looking for, the vehicle registration, the insurance, and his driver's license and the other tag.

Q.    And did you believe he had violated D.C. law by not having those items?

A.    Yes.

Q.    And I think you said -- I believe you said earlier, when I was asking you about searching for those items, that you were trying to give him the benefit; is that right?

A.    Yeah.  I don't really like writing tickets that much.  If I can find it, I won't write him a ticket.  But since I didn't find it, I ended up writing him the ticket.

Q.    Did you also believe or have some kind of suspicion at the time that there might be something else in the vehicle that could be criminal other than, you know, the license and the tag and those type of things?

MR. KRAMER:  Objection; irrelevant.

THE COURT:  Sustained.

MS. VANORE:  Okay.

THE COURT:  Ms. Vanore, let me ask you, are you trying to establish probable cause for another basis to search?  Is that what you're doing here?

MS. VANORE:  Yes, your Honor.

THE COURT:  Okay.  Because your filings to date have said that's not an argument you're making.

MS. VANORE:  Understood, your Honor, but I actually just had the chance to meet with the officer this morning due to his injury, and that's when he explained to me that this was another reason he would have went into the car.

THE COURT:  Okay.

MS. VANORE:  But I --

THE COURT:  Mr. Kramer, this was a specific issue the Court raised.

MR. KRAMER:  But they specifically -- they filed a

supplemental pleading specifically disclaiming any reliance on that.

THE COURT:  I know.  I think what they said was depending on what comes out at the hearing.

MR. KRAMER:  Well, they said they weren't relying on the automobile search, which is even less than probable cause. They said they specifically disclaimed reliance upon the automobile search doctrine in their papers.

THE COURT:  Did they say that, or did they say subject to what comes out at the hearing?

I'm reading at this time:  "Subject to change should additional facts be discovered at the hearing, the government does not believe probable cause existed to search the vehicle at the time of the search such that the automobile exception would be applicable.  The government believes the search is supported by consent."

MR. KRAMER:  I'm sorry.  What date is that, the filing?

THE COURT:  This is the -- I think it is -- a hole punched it out.

MR. KRAMER:  Sorry.

THE COURT:  Let me see.

MS. VANORE:  It would be the 13th.

THE COURT:  The 13th of July?

MS. VANORE:  Document 21.

THE COURT:  So Mr. Kramer, just for purposes of the hearing, I don't know that I'm going to consider it, but I'm inclined to allow the testimony, and we can argue about whether it's untimely later.

MR. KRAMER:  The question was, did you have some kind of feeling or suspicion.  That's certainly not relevant to probable cause.

THE COURT:  Say your question again.

MS. VANORE:  I don't object to counsel's characterization, and I don't need to pursue that line.  What I am pursuing here is that they had probable cause for the motor vehicle violations, and they were looking for evidence of that to either prove or disprove those motor vehicle violations.

So I was asking about suspicions as to other things, but I don't have to pursue that line of questioning.  That's fine.

THE COURT:  Okay.

MS. VANORE:  With that, I don't think I have any further questions at this time.

THE COURT:  Okay.  Mr. Kramer?

MR. KRAMER:  Thank you, your Honor.

                    CROSS-EXAMINATION

BY MR. KRAMER:

Q.   Officer Perez, good afternoon.

A.   Good afternoon.

Q.   So as I understand it from your direct testimony, this was

the first time -- when you were behind that car just before you stopped it, that was the first time you had ever seen this Hummer?

A.    I believe so, yeah.

Q.    Okay.  So let me read something to you.  "The officers had seen this same vehicle earlier in the day and noted the registration violation but had not conducted a traffic stop at that time because they were called to another assignment."

Is that not true?

A.    Yeah, I guess that could be true, yeah.

Q.    Which of it is true, your testimony today that you had never seen it before or that statement that you had seen it earlier in the day?

A.    I mean, it was a year ago.  I don't know if I -- I don't remember right now if we saw it earlier in the day.  But if you have it there, then I guess we saw it earlier in the day.

Q.    I'm just asking you to tell the truth.

A.    I am telling the truth.

Q.    Which one is the truth?  That's what I'm asking you.

A.    If I testified to that before, then I guess that's the truth.  I guess I just don't recall at this time if I saw it earlier in the day.

THE COURT:  Wait.  Have you testified before?

THE WITNESS:  Yes.

THE COURT:  In Superior Court in this case?

THE WITNESS:  Not in this case -- or earlier in the -- for other things.

THE COURT:  So I'm confused.  When you say "if I've testified to that before" --

THE WITNESS:  In the grand jury in the other hearings.

THE COURT:  Okay.

MS. VANORE:  Your Honor, I would ask Mr. Kramer to tell the Court and the witness what he's referring to.

THE COURT:  At this point, I'm familiar with the statement in the brief, and that's why I asked the question earlier.

But Mr. Kramer, do you have testimony to that effect?

MR. KRAMER:  No, but it's in the government's pleading, adopted by the government.  Obviously, it's true, I assume, or they wouldn't have put it in, because it's in their pleading, and they're the agent of the government.  So I'm trying to figure out where they get that statement from.

THE COURT:  Was it in your police report?  Do you know?

THE WITNESS:  I don't recall.  It was a year ago.  So --

BY MR. KRAMER:

Q.   So you have testified twice before about this stop; right?

A.   I believe it was two or three times, yeah.

Q.   You testified once in Superior Court; right?

A.    I don't recall.

Q.    At a preliminary hearing?

A.    Yeah, I believe it was a preliminary hearing.  I don't know exactly when that was.

Q.    September 11th, 2017, sound right?

A.    Sure.  I don't know the exact date.

Q.    Do you want me to show it to you --

A.    Sure.

Q.    -- if that would help?

A.    Please.

        MR. KRAMER:  Your Honor, may I approach?

        THE COURT:  Yes.

        MR. KRAMER:  Your Honor, I'm going to be going back and forth.  Do you want me to ask each time?

        THE COURT:  No, that's fine.  You may approach.

    (Counsel approached witness.)

        BY MR. KRAMER:

Q.    So does that refresh your recollection that it was September 11, 2017?

A.    Yes.

Q.    And you've also testified to the grand jury; correct?

A.    Yes.

Q.    I take it you've talked with Ms. Vanore a number of times?

A.    Today is when I met with her.

Q.    That's the first time you've ever talked to her?

A.    No, I've spoken with her before.

Q.    How many times?

A.    I don't know how many times I've spoken with her.

Q.    10?

A.    It could be.

Q.    Less than 10?  More than 10?

A.    I don't know.  I mean, throughout a year, I mean -- I spoke with her.  So --

Q.    In the first -- you looked for Jason Thomas's name -- when was the first time you did that during the stop?  I'm a little unclear.

A.    He gave us the name of Jason Todd Thomas as his employer, as his boss.

Q.    And then you went back and looked it up?

A.    We looked up the gentleman's name -- or the picture that he had on the driver's license that he gave us didn't look like him.  So we went to look up Mr. Todd Thomas to figure out who he was and try to -- how would we get in contact to try to figure everything out.  And that's when we ran it through the system.

Q.    As a matter of fact, you and Officer Prendergast had an extended discussion, right, about whether it looked like him on the license or not?

A.    Yeah.

Q.    Is that yes?

A.    Yeah.

Q.   So it wasn't just like you pulled the picture up and decided; there was an extended discussion between you and Officer Prendergast?

A.   Yeah, we talked about it.

MR. KRAMER:  This is a part of Government's Exhibit 1, your Honor, but it's just an excerpt, what's already in evidence.

THE COURT:  Okay.  Ms. Vanore, you don't have any objection to this, I take it?  You're not sure what it is yet, but if you do, let me know.

MS. VANORE:  I haven't actually seen it, but I assume it's from what I've entered.

MR. KRAMER:  It's an excerpt from Number 1. Obviously, if she thinks --

(Video played.)

MR. KRAMER:  We need to hook up the speaker.

THE COURT:  That's fine.  You don't need to make it as loud as it was before.

MR. KRAMER:  And somebody who knows what they're doing needs to do it.

(Video played.)

BY MR. KRAMER:

Q.   So right now, this is a registration that you're looking at?

A.   Temporary tag, yeah.

Q.   Temporary tag?

A.   Temporary registration, yes.

Q.   And Mr. Thomas, when he had stepped out of the car and reached into the back seat, this is what he handed you?

A.   Yes.

Q.   You're looking at it right now, right here?

A.   Yep.

Q.   And you're saying this is invalid, it expired in May?

A.   I believe I was saying that the tag on the car was expired, and I believe that as well, yes.

Q.   Do you want me to play it again and see?  Can we go back?

A.   Sure.

     (Video played.)

Q.   So you are talking about the registration at that point. You're saying "this," and you're flapping it.

A.   I pointed to the tag.  So I'd have to say I was referring to the tag on the vehicle.

Q.   Okay.

     (Video played.)

Q.   So you're saying that -- first of all, you said that he -- just before that excerpt, that he said, "You can check me; you can check it"?

A.   Yep.

Q.   And you were asked your answer on direct examination, and you said you thought you said something like "okay," but you

weren't sure; is that right?

A.   I don't know exactly what I said, but I said we were trying to -- I was worried about the registration at that point.

Q.   What you actually said was "no"; right?  Do you want me to play it back for you?

A.   Sure.

     (Video played.)

Q.   So when you claim that he said those words, you said, "No, we're just trying to check the tag."  That's what you said; right?

A.   I don't know if I said that, but that's what it sounds like.

Q.   Do you want to hear it again?

A.   I heard it.  I just said, I don't know what I said, but that's kind of what it sounds like, like I'm saying no, I'm just worrying about this tag right now.

Q.   So you said "no."  You claim that those words meant -- those words meant that you could search the car; right?

A.   Yep.

Q.   But your response was, "No, we're just worried about the tag"?

A.   "No, I'm worried about that tag right now."

Q.   But he had just said, according to you --

A.   Yep.

Q.   -- your interpretation of it?  Because he never mentioned

the word "car"; right?

A.    No.

Q.    He never mentioned the word "vehicle"?

A.    No.

Q.    He never mentioned the word "Hummer"?

A.    Nope.

Q.    You never asked him, "When you say "it," do you mean the car?"

A.    No.  I didn't have to.

Q.    Because you believed in your mind it meant the car?

A.    Correct.

Q.    You never asked him, "Do you mean the vehicle"?

A.    No.

Q.    You never asked him, "Do you mean the Hummer?"

A.    No.  I didn't have to.

Q.    Because in your mind, you interpreted it?

A.    Correct.

Q.    So whenever you say "I didn't have to," that's because of your interpretation of what was said?

A.    Correct.

Q.    So you never said to him, asked him to explain -- when you say, according to you, he said "check it," you never said, "Do you mean the car?"

A.    No, I didn't ask him that.

Q.    You never said, "Do you mean the vehicle?"

A.    No.  I didn't have to.

Q.    You never said, "Do you mean the Hummer?"

A.    Nope.

Q.    You never asked him, "Is it okay if we search the car?"

A.    I never asked him.  He just told us.

Q.    He didn't tell you you could search; right?  According to you, the words are, "Check me" -- "You can check me; you can check it"?

A.    Correct.

Q.    According to you; right?

A.    And him.  That's what he said.

Q.    Okay.  Let me play you the audio, just the audio without the video.

A.    Okay.

      (Audio played.)

Q.    Again, this is an excerpt off of Government's Exhibit Number 1.

      (Audio played.)

Q.    So when you heard that video, did you hear, "Check me; search me; I don't care"?

A.    I heard that he said, "You can check me; you can check it; I'm good; I don't care."

Q.    You heard "check me; check it"?

A.    Yep.

Q.    But you, again -- now you've heard it again.  You said,

"No"?

A.   You could say "no."  You could say "you know."

Q.   The first thing you said after he said that was, "No, we're just worried about the tag"?

A.   Yeah, I was just worried about the tag at that time.

Q.   So after he said these words that you interpreted to mean you can search the car, you said, "No, we're just worried about the tag."

A.   Yeah, I'm talking to him about the tag at that time.

Q.   Now, when you testified to the grand jury -- do you recall testifying to the grand jury --

A.   Yes.

Q.   -- in this case?  You do remember that?  That was on October 19, 2017?  Do you want to see that?

A.   Sure.

     (Counsel approached witness.)

Q.   So October 19, 2017?

A.   Correct.

Q.   So the first time you testified about these words to the grand jury, what he said there, you said, "You can check me; you can check it."

     Do you want to see that?

A.   Sure.

Q.   It's on page 5, line 3.

     (Counsel approached witness.)

Q.    Just read it to yourself.

A.    Okay.

Q.    So the first time you testified about it in the grand jury, you said "you can check me; you can check it" was what he said; right?

A.    Correct.

Q.    Was what Mr. Thomas said.  Then a couple pages later, page 7, line 22 --

A.    Uh-huh.

Q.    -- you testified -- a couple pages later, you reversed it. You said what he said was, "You can check it; you can check me." That was the reverse of what you had said earlier; right?

A.    Yep.

Q.    So I take it your memory -- was that just your memory not being good again?

A.    No.  It just was backward.

Q.    You flipped it?

A.    Correct.

Q.    So one of those is not correct?

A.    Yep.

Q.    Which one is not correct?

        MS. VANORE:  And your Honor, I'm going to object at this point.  We've heard both video and audio of the actual statement.

        THE COURT:  Right.  I'm wondering, Mr. Kramer, clearly

he's been inconsistent, but beyond that, we do have the tape. So do we really need to delve into this? You've established that he said two different things about this, but we also have the tape.

MR. KRAMER: All right. Okay. I actually have to ask him some more things about it different, but I will ask him about that later. I will withdraw that question, your Honor.

THE COURT: Okay.

BY MR. KRAMER:

Q. You talked about the reason you were searching the car was to look for paperwork with his name on it?

A. It was one of the reasons, yeah.

Q. That was the main reason at that time, right, because he had given you documents that you thought were false or not up-to-date or incorrect?

A. That was one of them, yes.

Q. Are you telling me there was really another reason you were searching?

A. Yeah. He gave us verbal consent to search the car.

Q. But that was to look for paperwork, you thought.

A. No, he never said that we couldn't just look for paperwork. He gave us verbal consent to search the car.

Q. He never said you could search the car, period; right? He never said those words?

A. He never said those exact words.

Q.   He never said, "You can search the car"; right?

A.   No, he never said those exact words.

Q.   So when you say he gave consent to search the car, he actually never said those words; right?

A.   He never said those exact words.

Q.   And you were or were not looking for paperwork with his name on it?

A.   I was.

Q.   Okay.  You told the grand jury the exact opposite; right?  You said, "I wasn't looking for any paperwork with his name on it.  So I can't tell you really whether paperwork" -- the question was whether you found any paperwork specifically that linked him to the vehicle, and your answer was, "I wasn't looking for any paperwork with his name on it.  So I can't tell you really."

          MS. VANORE:  Can I ask for a citation?

          MR. KRAMER:  I'm sorry.  Page 14, lines 3 and 4.  It's the preliminary hearing.  I apologize.

          BY MR. KRAMER:

Q.   So let me go back.  This is a preliminary hearing in Superior Court.  Do you want to see that testimony?

A.   Sure.

Q.   Page 14, lines 3 and 4.

     (Counsel approached witness.)

A.   Okay.

Q.   So in Superior Court last September, you said, "I wasn't looking for any paperwork with his name on it."

A.   That's correct.  I was looking for --

Q.   So that was not true, or that is true?

A.   No, I was looking for paperwork regarding the car, the vehicle, the registration, the insurance, and that.  I wasn't looking specifically for his name on it.  I was looking for the car registration and insurance, his driver's license, stuff like that.

Q.   You were looking for paperwork to see if there was a proper registration; right?

A.   Correct.

Q.   And you were looking for paperwork to see if there was a proper license that he had?

A.   If he had one, yes.

Q.   And you're telling me that his name being on it, you weren't looking for anything with his name on it?

A.   I mean, his name could be on it.  It could be his friend's name on it.  I mean, paperwork -- people have paperwork for a driver's license.  He has a card for a driver's license.  So regarding paperwork, it can -- anybody could be registered to the car.  We were just trying to figure out if the car was actually registered or not.

Q.   I thought you were looking for a driver's license, too.

A.   We were.  We were looking for multiple things.

Q.    That would have to have his name on it?

A.    I would assume so, yeah.

Q.    Right?  You assume so?

A.    Well, he did give us a false name and a false driver's license.  So I hope that, if I found one, it had his correct name on it, yes.

Q.    But you weren't looking for anything with his name on it, according to your testimony here.

A.    I mean, at that time, I don't know.

Q.    Let me ask you about another statement.  Did you -- and this is at page 2 of the government's June 8th pleading.  And it's in quotes.  It says, "I'm good.  Check me.  Check it.  I'm good."  That doesn't have the "you can check me."

      Did this come from you to Ms. Vanore, or did that not come from you?

A.    I don't understand your question.

Q.    Okay.  So in the government's pleading -- I'll show it to you.

A.    Sure.

      THE COURT:  He may not have any ability to say where that statement came from.

      MR. KRAMER:  That's all I'm trying to find out.

      THE COURT:  You can ask the question, but make sure he understands.

      (Counsel approached witness.)

THE COURT:  Do you know where that statement came from?

THE WITNESS:  That's -- I don't know.

BY MR. KRAMER:

Q.   But that's not what was said; correct?

A.   It's pretty much what he said.

Q.   It's kind of similar, but you said "you can check me; you can check it" is what he said; correct?

A.   Yeah, that's what I believe he said, "You can check me; you can check it."  "You can check it; you can check me."

Q.   And you were the -- Officer Prendergast did not hear this conversation?

A.   No.  He was in the car.

Q.   He was back in his car.  So you and Mr. Thomas were the only two people present when these words were said?

A.   Yes.

Q.   And you didn't ask him for any clarification?

A.   No.  I didn't need it.

MR. KRAMER:  And in the same vein, your Honor, I'm going to show him a pleading from July 13th of the government's pleading.

(Counsel approached witness.)

THE WITNESS:  Okay.

BY MR. KRAMER:

Q.   So do you have any idea where this came from in the

government's pleading of July 13th, in quotes, "I'm good; you can search me; search it"?

A.   No.

Q.   Because that's different than what you've testified about what was said; correct?

A.   Yep.

Q.   You talked about talking to Mr. Thomas about driving his car -- at first you said around the corner --

A.   Uh-huh.

Q.   -- correct?

A.   Yeah.

Q.   You have to say yes or no for the --

A.   Yes.  Sorry.

Q.   And then I think it was Officer Prendergast said, "Or we can drive it back to the station"?

A.   Yes.

Q.   Nothing was said about towing it anywhere; correct?

A.   No.

        MR. KRAMER:  Again, your Honor, I'm going to show him something from the government's pleading of June 8th.

    (Counsel approached witness.)

        THE WITNESS:  Okay.

        BY MR. KRAMER:

Q.   So the June 8th pleading on page 3, where it says, "The officers told the defendant they could leave it parked around

the corner or have it towed," that's incorrect?

A.    Sure, yeah.

Q.    Nothing was said about having it towed?

A.    I don't know.  I don't remember.

Q.    Not while you were there?

A.    I don't remember then.  It could have been when I wasn't there, but I don't remember.  It's been a year now.

Q.    Did you see anything on the portions of the tape that we played to you -- when he was being asked about did he want it parked around the corner or taken to the station, there was nothing mentioned there about being towed; correct?

A.    I don't think so.  But I mean, it could have been brief, that I just missed it.  But I don't know.

Q.    You talked about you didn't need to get the consent to search in writing because you had a body camera?

A.    Yeah, he gave it to us verbally, yes.

Q.    And he gave it -- I'm sorry.  You claim he gave it to you verbally, and you recorded that on the body camera; right?

A.    Yes.

Q.    So you didn't need to get it in writing at all?

A.    Yes.

Q.    But that's not what the Metropolitan Police Department general orders say, is it?

A.    I don't know.

Q.    Are you familiar with them at all?

A.    I don't know what it says exactly.

MR. KRAMER:  Your Honor, I can provide a copy to the Court, if you want.  I have another copy I can go over with the witness.

THE COURT:  If you have an extra copy, that would be great.  If you don't, I'm okay without it for now.  At some point, I would like it.

MR. KRAMER:  I will get it.  I'm sorry.  I apologize.

(Counsel approached witness.)

BY MR. KRAMER:

Q.    Can you read that to yourself?

THE COURT:  Mr. Kramer, again, what is this document?

MR. KRAMER:  This is an executive order from the Metropolitan Police Department, and the second document is the general orders of the Metropolitan Police Department.

Your Honor, I don't know if you plan on taking a break.  It may take him a while to read this.

THE COURT:  I wasn't planning on it, but how long --

MR. KRAMER:  That's fine.

THE WITNESS:  That's fine.

BY MR. KRAMER:

Q.    So this executive order is about body cameras?

A.    Yes.

Q.    BWCs, as they're referred to?

A.    Yes.

Q.   And it is executive order number EO-17-008, issued March 10th, 2017; is that correct?

A.   Yes.

Q.   And it says, "When practicable, there shall be at least one BWC-equipped member present with the camera activated prior to a consent to search being conducted," and it says, "Both the consent and the search shall be documented by a body-worn camera-equipped member"; correct?

A.   Yes.

Q.   And it goes on to say, "The BWC documentation shall be in addition to the documentation requirements outlined in the general orders," and it gives a number, "GO-PCA-702-03," and it says, "I.e., documentation of the consent to search on the PD Form 781"; correct?

A.   Sure.

Q.   Do you want to read that again?

A.   I believe you about the number and everything.

Q.   So in other words, what this says is that there is supposed to be -- the body-worn -- the BWC, the body-worn camera, is not enough, that it's also supposed to be documented on documentation requirements in the general orders; correct?

A.   Sure, yes.

Q.   So did you not know of the general orders?

A.   I didn't -- no, I didn't know that we had to get a written at the same time at that time.

MR. KRAMER:  Could I have just a moment, your Honor?

THE COURT:  Sure.

BY MR. KRAMER:

Q.   One of the things -- do you want me to show you the general order?

A.   If you would like.

Q.   I will read it to you, if you trust me.

A.   I trust you, yeah.

Q.   One of the things it says is -- and this is page 18 of the general orders.  It says, "Members may search any object, place, or person if consent for that search is given by a person with legal authority to do so."

A.   Okay.

Q.   That sounds correct?

A.   Sure.

Q.   And then it says, "Consent searches must be limited to the exact words or meaning of the consent."

A.   Okay.

Q.   Is that correct?

A.   Yes.

Q.   So you never asked Mr. Thomas what the exact meaning of the words that you claim were his consent?

A.   No, I did not ask him the exact words, but from my understanding, meaning that we could search the car and his person.

Q.   No, no, I understand that, but what I'm saying is, when the general order says it must be limited to the exact words or meaning of the consent, that was just what you understood the meaning to be?

A.   Correct, that we could search the car.

Q.   And you are supposed to -- it says, "Member shall use the PD Form 781, consent to search, to document the consent to search"; correct?

A.   Sure, yeah.

Q.   You did not use that form?

A.   No, we didn't have any.

Q.   You don't have those in your patrol car?

A.   No.

Q.   "Or document who gave the consent to search, the relationship of the person giving the consent to search, and the time the consent was given."

A.   It was all documented on the body camera.

Q.   Okay.  But this -- but what the executive order says, this is supposed to be done in addition to the body camera; correct?

A.   I understand, yeah.

Q.   You mentioned that you drove the -- you drove the patrol car back to the First District?

A.   Yes.

Q.   And Officer Prendergast drove the Hummer?

A.   Yes.

Q.   But you left out a part.  You didn't drive right back to the station after you -- at some point, Mr. Thomas was taken by a transport, and you were still on the scene?

A.   Yes.

Q.   And then you drive away, but you left out -- you didn't drive right back directly to the station.

A.   Where did I drive, then?

Q.   You made a traffic stop, another traffic stop, didn't you?

A.   I don't remember.

Q.   I'll play it for you.

A.   Sure.

Q.   As a matter of fact --

A.   I don't remember that at all.

Q.   And you don't remember that Officer Prendergast stopped along with you in the Hummer?

A.   No, I don't remember at all.

THE COURT:  Mr. Kramer, why is this relevant here?  We know what the time is that lapsed from the time they left the scene to the search.

MR. KRAMER:  Two things, because I don't think it's accurate, because they made a traffic stop on the way back.

THE COURT:  You mean you don't think the time reflected on the tape?

MR. KRAMER:  No, he said that they went -- that it took them 20 to 30 minutes to get back.  In response to

questions, he said "we drove back" -- not back, I'm sorry.  "We drove to the First District," and that's not accurate testimony. So I think it goes to his credibility, as well as the timing. They tried to say it was 20 or 30 minutes back to the First District, but that's also not correct, because they made a traffic stop on the way.

THE COURT:  Okay.  Well, just keep it short.  You can definitely impeach him, but I don't know that the details of that stop are --

MR. KRAMER:  I'm not going to get into details.  He said he doesn't remember.  I can show him a still picture.  I guess I will try that.

THE COURT:  And these are stills off the body camera tape you were given?

MR. KRAMER:  It's a different body camera.

THE COURT:  Not one that's in evidence?

MR. KRAMER:  It's not the one that was played, no.

THE COURT:  Has the government seen these?

MS. VANORE:  I have not.

MR. KRAMER:  Pardon me.  I missed --

THE COURT:  Has the government seen these stills, these photos?

MR. KRAMER:  No.  They have -- we got the tape from them, the body camera tape from them.  I can play that.

THE COURT:  Ms. Vanore, do you dispute that there was

another stop?  Can we just agree that this happened?

MS. VANORE:  Your Honor, honestly, I haven't reviewed Officer Prendergast's video in a long time, because he's not testifying.

THE COURT:  Go ahead.

MR. KRAMER:  I will show him the picture to see.

(Counsel approached witness.)

MR. KRAMER:  I guess I will mark it Defendant's Exhibit 1.

BY MR. KRAMER:

Q.   Do you recognize that picture?

A.   The only thing I recognize is the car.

Q.   This car?

A.   The Hummer.

Q.   The Hummer?  Okay.

A.   Yeah.

Q.   You don't recognize that as taken off of your body camera?

A.   No, I don't.

MR. KRAMER:  I'll have to find it on the tape, your Honor, then, and play it.

THE COURT:  Okay.

MS. VANORE:  Your Honor, I want to object and say this is not Officer Perez's body-worn camera.

THE COURT:  This is Prendergast who, according to Mr. Kramer, was with Perez; right?  Am I correct?  Am I

understanding that what you're saying happened is they left together and they made this stop together?

MR. KRAMER:  Yes.

THE COURT:  Even though this is Prendergast's body camera, he was present for all of this?

MR. KRAMER:  Yes.

(Video played.)

BY MR. KRAMER:

Q.    Is that you?

A.    Yes.

Q.    That's you; right?  Okay.

(Video played.)

Q.    Did you just see the Hummer up ahead?

A.    I did.

Q.    Does this refresh your memory that you made a traffic stop on your way to the First District?

A.    I still don't remember.

Q.    Okay.  I will keep playing.

A.    I see that's what it appears, but I don't recall any details around that.  I don't.

(Video played.)

THE COURT:  Mr. Kramer, do you mind stopping it and see if he recognizes this?

BY MR. KRAMER:

Q.    Is this bringing the memory back at all?

A.    No.  I don't know why they were stopped.  Sorry.

THE COURT:  Ms. Vanore, do you have any objection to them entering this into evidence?  Is there a question as to whether this is really the body camera of Officer Prendergast?

MS. VANORE:  No, your Honor.

THE COURT:  Can we just offer it?  I don't know that it's worthwhile to keep asking him about this.  You've established that he has no recollection of this stop.

MR. KRAMER:  Surely.

BY MR. KRAMER:

Q.    I wanted to ask you -- if I can stop for a minute and go back to something else.

Why did you run the tags on the Hummer?

A.    Why?

Q.    Yes.

A.    I don't recall at this time why, but it came back not registered.

Q.    You have a Hummer being driven by a black man; right?

A.    I don't know who was driving.

Q.    You couldn't see who was driving the Hummer when you ran the tags?

A.    No.

Q.    Why did you run them?  I don't understand.  You couldn't see anything wrong with them; right?

A.    Yeah, you could see that they were expired.

Q.   From your car, you could see they were expired?

A.   Yeah, on the back -- on the tags, they do have expiration stickers, and it did say May 2017.  So that's kind of a red flag that the car is expired.

Q.   So that's why you ran the tags?

A.   I'm pretty sure that's why.

Q.   You said in your testimony that you just did it randomly. Is that not correct?

A.   That's correct.  We run tags randomly as well.

Q.   I'm trying to figure out which it is, randomly or you saw they were expired, because you testified randomly.

A.   Yeah, both.

Q.   Both?

A.   Yeah.

Q.   Okay.  And there was nothing preventing you from asking Mr. Thomas for clarification about what he had said?  You could have easily asked him -- when you say, according to you, he said, "Check me; check it" --

A.   Oh, okay.

Q.   I'm sorry.  I'm back on that.  When you say that's what he said, there was nothing preventing you from asking for a further explanation?

A.   No.  In my understanding, I didn't need it.

Q.   Your understanding based on what?

A.   What he said, that we could check the car.

Q.   So that's just, in your mind, you didn't need any further explanation?

A.   My understanding, I didn't need any other clarification, that he gave us verbal consent to search the car.

Q.   Where did that understanding come from?  That's what I'm trying to get at.

A.   When he said, "You could check the car."

Q.   He didn't say, "You could check the car," though; right?

A.   No, he didn't.  He said, "You can check it."  So my understanding, "it" referring to the car, I understood that we could check the car.

Q.   When you said -- you have at that point the registration in your hand?

A.   Correct.

Q.   And he said, "You can check me; you can check it," right, according to you?

A.   Correct.

Q.   And you didn't say, "Do you mean check the registration or search the car?"  You didn't ask him anything like that; correct?

A.   No.

     THE COURT:  Officer Perez, did he gesture in any way when he said "check it"?

     THE WITNESS:  I believe he rose his hand up, and he said, "You can check me; you can check it," meaning the car and

himself.

MR. KRAMER:  Let's play that.

(Video played.)

BY MR. KRAMER:

Q.   Okay.  So he had his hands in his pockets when he said that; right?

A.   Just before that, he put his hands up in the air.

Q.   That's when he said, "I just came from Chick-fil-A" and pointed, and the Chick-fil-A was in that direction, just a couple blocks away?

A.   It was in the opposite direction, but it was a couple blocks away.

Q.   It was a couple blocks away.  And he said, "I just came from Chick-fil-A," and that's when he pointed; correct?

A.   Yeah.  He was pointing the wrong way, but he was pointing.

Q.   Then he put his hands in his pockets?

A.   No.  He rose his hands up in the air, and then he put his hands in his pockets.

Q.   Can you play it again.

(Video played.)

Q.   Okay.  So at that point when he said, according to you, "Check me; check it," his hands are in his pocket?

A.   Yep, right there.

MR. KRAMER:  Okay.  Thank you.  Let me just -- nothing further, your Honor.

THE COURT:  Okay.  Any redirect?

MS. VANORE:  Yes, your Honor.

REDIRECT EXAMINATION

BY MS. VANORE:

Q.   Good afternoon again, Officer Perez.

A.   Good afternoon.

Q.   You were asked several times to answer questions about documents that I have written and submitted to the Court.  Have you ever seen those documents before?

A.   I don't think so.

Q.   Did you and I sit down as I was writing my submissions to the Court, and did I show them to you for accuracy?

A.   No.

Q.   Okay.  When we met, it was prior -- we met prior to your grand jury testimony; is that right?

A.   Yes.

Q.   And we met earlier today just prior to your testimony today; is that right?

A.   Yes.

Q.   And we've also spoke on the phone regarding scheduling, particularly in light of your accident; is that correct?

A.   Yes.

Q.   But you and I didn't sit down as I was typing my briefs; correct?

A.   No.

Q.    So it is fair to say that any inaccuracies within those briefs are my fault and not yours; correct?

A.    Yes.

Q.    And I also want to talk to you, you were also asked about these general orders.  Have you ever -- these general orders that were produced by the defense today, have you ever seen these prior to today?

A.    I've seen them before, but I don't recall them exactly word for word.

Q.    Okay.  And the first that you were shown -- I'm going to approach.  This is the series 702, number 03.  What's the effective date on that?

A.    December 23, 2013.

Q.    Do you know if this is the most updated or not?

A.    I'm not sure.

Q.    Okay.  And that -- and in 2013 -- were you even on MPD in 2013?

A.    No.

Q.    Do you know whether MPD was using body-worn cameras for all officers at that time?

A.    I don't know.

Q.    Okay.  And you were asked specifically about page 18.  I'm going to look along with you because I have one copy.  This says in part J on page 18 that consent searches, looking at J1B, that members shall use the form; correct?

A.    Uh-huh.

Q.    Then it says, bold underlined, "or document (e.g.,
notebook, field report) who gave the consent," et cetera.

       Is that saying that you should use the form or document in
some other way?

A.    Correct.

Q.    Okay.  And this was, again, issued before body-worn
cameras?

A.    Yes.

Q.    Fair to say that body-worn cameras are a way that you
document what you do all the time; correct?

A.    Correct.

Q.    And also fair to say that the body-worn camera often shows
you more than what you're able to put in a written report?

              MR. KRAMER:  Objection; leading.

              THE COURT:  Sustained.

              BY MS. VANORE:

Q.    All right.  And are there times when it's not practical for
you to use a consent form?

A.    Yes.

Q.    And what might some reasons for that be?

A.    Just a safety issue.

Q.    And do you believe that you had any in your car at that
time?

A.    I don't think so.  I didn't have any.  I don't think my

partner had any either.

Q.   And the MPD general orders -- well, who puts these out?  Do you know?

A.   I don't know exactly who puts them out.

Q.   But it's someone within MPD?

A.   Yes, I believe so.

Q.   And it's what MPD has decided should be best practices for police; correct?

A.   Correct.

Q.   Okay.  And you were also asked about, towards the end of your cross-examination, about why you ran these particular tags.  Do you run tags at random?

A.   Sometimes, yes.

Q.   All right.  And that's just based on what you can see while you're sitting in your car; correct?

A.   Yes.

Q.   Okay.  Had you ever seen Mr. Thomas before?

A.   No.

Q.   Had you or -- if you know, had you or your partner had any interaction with him before?

A.   No.

Q.   Had you ever pulled him over before this date?

A.   No.

Q.   You were also asked multiple times about what you exactly said while you were in front of the grand jury.  Was the

body-worn camera, as you recall, also played for the grand jury?

A.    Yes.

Q.    Okay.  So what you said and what Mr. Thomas said was also played for them; is that right?

A.    Yes.

Q.    And I would actually just -- I don't want to take the time to switch, but I would ask if we could play this clip one more time.

THE COURT:  Sure.

MS. VANORE:  I don't know if it's possible, when I say "stop," if Ms. Goetzl could stop.

MS. GOETZL:  Sure.

BY MS. VANORE:

Q.    Officer, I'm going to play this clip one more time.  This is the last time I'm going to ask it to be played.  You were asked about any gestures the defendant might have made.  I'm going to ask you to watch it, this time specifically looking for gestures.

A.    All right.

MS. VANORE:  You can start it.  You can go past the siren.

(Video played.)

BY MS. VANORE:

Q.    This is 0:25 into this clip.  What did you see there as far as any gestures from Mr. Thomas?

A.    He did point.  He rose his hands a couple of times.  Then he put his hands in his pockets.

Q.    Okay.  When his hands were in his pockets, did you see them move while they were in his pockets?

A.    I don't think he moved them from his pockets, but he was moving them around in the pockets.

MS. VANORE:  Could I ask that you back it up to 0:20 and play that one more time.

(Video played.)

BY MS. VANORE:

Q.    You can stop it there again at 0:26.  Specifically when he says "check me, check it," did you see any movement from his hands?

A.    Yeah, it looked like his hand was moving around in his right pocket.

Q.    And his right pocket is the hand closest to the vehicle; correct?

A.    Correct.

Q.    And you were asked a number of times about "check me, check it," that he said "it," he never specifically said "car" or "vehicle."

Was there anything else other than his person and Mister -- and his vehicle that you could have checked?

A.    No.

Q.    Were there any other people, passengers or anything, that

could have been checked?

A.    No.

Q.    Was there a bag or a wallet or anything that he had taken out at that time?

A.    No.

Q.    Okay.  And I also wanted to ask you, you were asked about that traffic stop on the body-worn camera that looks like you made another traffic stop between this one and going back to the station; is that correct?

A.    I guess so, yeah.

Q.    Okay.  Did you do the search the same day that Mr. Thomas was arrested?

A.    Yes.

Q.    And in fact, did you fill out -- after Mr. Thomas was arrested for everything, including the firearm, after you found the firearm, did you fill out some paperwork for -- as required by MPD?

A.    Yes.

Q.    I'm going to show you that.  I had premarked some other exhibits.  So I believe this will be Government's 4.  This is just the Cobalt arrest packet.

      Do you recognize that?

A.    Yes.

Q.    What is it?

A.    It's the arrest packet that I prepared that day.

Q.   Okay.  And what does it list as the arrest date and time at the top?

THE COURT:  Are you offering this?

MS. VANORE:  Yes, I would offer this as Government's 4.

THE COURT:  Any objection?

MR. KRAMER:  I'm not sure what it's being offered for, your Honor.

THE COURT:  I think she's trying to establish the length of time from the time they stopped him on the street until they got back to the station, I think.

Is that right, Ms. Vanore?

MS. VANORE:  That's right, your Honor.

THE COURT:  Maybe you can just stipulate that it was, as I see it, an hour, and you may not need the arrest packet to be in evidence.

MR. KRAMER:  If she could just show me where that is.

MS. VANORE:  That's later that same day.  I'm trying to establish that it was later that same day.

THE COURT:  So are the time stamps on the videos accurate?  Can we rely on the time stamp at the scene of the search and then the time stamp back at the station?  Are those accurate?  That looks like an hour to me.

MR. KRAMER:  The camera's off -- when they leave the cameras off, they don't activate it again.  So I believe the

time on that is the running time.

THE COURT:  Well, the stop occurred at roughly 5:30, and it's still daylight back at the station.  So I don't know if we can take judicial notice of when the sun set that day, but it's not a super long time.  This is September.  I don't know.  Daylight Savings?  I'm not sure.

MR. KRAMER:  I'm trying to look and see --

THE COURT:  If you all can agree on the time, I don't think that it needs to come in.

MR. KRAMER:  I mean, I see the time of the arrest, obviously, but I don't see -- and I see another time, about two hours later, when he was advised of his rights by the detective.  So there's a two-hour gap between the time he was arrested and the time he was questioned.

THE COURT:  I thought that happened much later, like 11:00 at night.

MS. VANORE:  It would have been the same -- later that same evening.

THE COURT:  But not two hours after -- oh, the arrest was not at the scene of the search?

MR. KRAMER:  I assume it was.

THE COURT:  Then that was much later, the interview.

MR. KRAMER:  Well, it says, "Advised of rights, September 7, 17:36" -- "19:36," I'm sorry, two hours later.

THE COURT:  It seems like this is something you all

ought to be able to agree.  I don't know how critically important it is.  You've impeached him that he forgot what he did in between the two, but in terms of the length of time --

MR. KRAMER:  I think that's right.

THE COURT:  Okay.

MS. VANORE:  Just so I am clear, we are agreeing that it occurred that same day and a few hours later?

THE COURT:  I think it is important to establish the timing, but I don't know that you need to offer this in evidence.  If they have some objection, there ought to be another way to do this.

MR. KRAMER:  We don't dispute that the search was later that day, obviously, yes.

THE COURT:  But to the extent the length of time matters and the government wants to introduce evidence of that, I would hope you all would be able to agree and stipulate as to what that gap of time was.  It's no more than, it seems, a couple hours, but there ought to be a way to do that.

BY MS. VANORE:

Q.   So Officer Perez, your recollection has been refreshed that you did do another traffic stop; correct?

A.   Yes.

Q.   Based on what you saw and, I guess, how long you typically take to do traffic stops, did that -- do you recall that being any lengthier than a typical traffic stop?

A.    No.  It was actually a lot shorter.

Q.    Okay.  So even given the possibility that there was traffic and the fact that you conducted another traffic stop, did you then go immediately back to the station, as you recall?

A.    Yes.

Q.    And when you got to the station, did you go inside or do anything else before starting to search the Hummer?

A.    No.

Q.    Okay.  So even given an extra -- how long would you say an average traffic stop would take you?

A.    My traffic stops usually take 10 minutes, but from that body camera footage, I think it was around like three or four minutes.

Q.    Okay.  So would it be fair to say that it was still maybe within two hours that you conducted the search of the Hummer?

A.    Yes.

Q.    Okay.  And that's as soon as you were able to do so?

A.    Yes.

        MS. VANORE:  Thank you.  I don't have anything further.

        THE COURT:  Anything further?

        MR. KRAMER:  No, your Honor.

        THE COURT:  Do you have another witness, Ms. Vanore?  May this witness be excused?

        MS. VANORE:  Yes.

THE COURT:  Do you have another witness?

MS. VANORE:  I do have one more witness.

THE COURT:  Ms. Vanore and Mr. Kramer, the "Z" on the clips, the "Z," does that stand for Zulu time?  And if so, is that some universal time that comes back -- comes on accurately, regardless of whether the body camera is turned on and off?  Do you all know the answer to that?  Ms. Goetzl?

MS. GOETZL:  Yes, your Honor.  It's my understanding, from looking at the time stamps on many body-worn camera videos in a number of cases and also talking to our technology person, that it is Universal or Zulu time, which is four hours ahead. So when it says "21," it would be 17, which would be 5:00.

THE COURT:  But are the times accurate when the body cameras go on and off?  Do they track realtime, or are they --

MS. GOETZL:  That, I can't speak to.

JOSEPH PRENDERGAST, WITNESS FOR THE GOVERNMENT, SWORN

DIRECT EXAMINATION

BY MS. VANORE:

Q.   Good afternoon, Officer Prendergast.

A.   Good afternoon.

Q.   Could you state and spell your name for the record.

A.   Officer Joseph Prendergast, J-o-s-e-p-h P-r-e-n-d-e-r-g-a-s-t.

Q.   How are you employed?

A.   Metropolitan Police Department.

Q.   How long have you been with MPD?

A.   Four years.

Q.   What district are you with?

A.   First District.

Q.   Have you always been with the First District?

A.   That's correct.

Q.   Were you working with the First District back on September 7th of 2017?

A.   That's correct.

Q.   Were you working at around 5:00 in the afternoon?

A.   That's correct.

Q.   Who were you with at that time?

A.   Officer Perez.

Q.   Was it just you and Officer Perez?

A.   That's correct.

Q.   Were you in a marked patrol vehicle?

A.   Yes, ma'am.

Q.   Were you wearing a uniform like the one you're wearing today?

A.   Yes, ma'am.

Q.   And did you participate in a traffic stop with an individual by the name of Jason Todd Thomas?

A.   Yes, ma'am.

Q.   Do you see that person in court today?

A.   Yes, ma'am.

Q.    Could you, please, identify him.

MR. KRAMER:  We will stipulate, your Honor.

THE COURT:  Okay.  Let the record reflect that the witness has identified the defendant.

BY MS. VANORE:

Q.    And Officer, your partner has already testified.  So I'm not going to ask you all of the details of that traffic stop. But did you eventually -- what kind of vehicle was that person driving?

A.    It was a yellow Hummer.

Q.    And was that Hummer eventually taken back to your station, as well as the defendant?

A.    That's correct.

Q.    Why was the defendant placed under arrest after your traffic stop?

A.    He was placed under arrest -- it was for the misuse -- sorry, not misuse, for the warrant, bench warrant.

Q.    And why did you take the vehicle back to the station?

A.    Because he wanted it back there at the station.

Q.    Did you and Officer Perez search the vehicle back at the station?

A.    That's correct.

Q.    And why did you search the vehicle?

A.    Because Officer Perez told me he had gotten consent to search the vehicle.

Q.    Did you hear Mr. Thomas give consent?

A.    No.

Q.    Okay.  And if you recall, and it's fine if you don't, but do you recall exactly what Officer Perez told you about him giving consent?

A.    I don't remember exactly what he said.  He had just, you know, basically said, "Yeah, I got consent; we can search the car."

Q.    And it was with that understanding that you searched the car?

A.    That's correct.

Q.    And what did you recover while you were searching the car?

A.    I recovered the firearm.

Q.    Where was that?

A.    It was up in the sun roof, between the window and the slider.

Q.    Okay.  And was it sitting there on its own?

A.    It was in a bag.

Q.    Okay.  Had you driven the Hummer back to the station?

A.    I did.

Q.    And other than the defendant on scene and you, had anyone else been in the Hummer prior to you recovering that firearm that you're aware of since you saw the Hummer?

A.    Not that I can recall.

MS. VANORE:  Thank you.  I don't have anything

further.

THE COURT:  Mr. Kramer?

CROSS-EXAMINATION

BY MR. KRAMER:

Q.   Is it Prendergast?

A.   It's Prendergast.

Q.   So as I understand it, you randomly ran the tags on the Hummer when you were behind it at some point?

A.   Yeah, we ran the tags, yes.

Q.   That was just a random?

A.   Yes.

Q.   How did you pick out the Hummer to do that?

A.   Just randomly picked it out.

Q.   Had you seen the Hummer earlier that day?

A.   I can't remember.  I just remember at that point running the tag.

Q.   And then at some point, Officer Perez told you that he had gotten permission to search the vehicle?

A.   That's correct.  He was told that he had gotten --

Q.   But you hadn't heard Mr. Thomas say that?

A.   That's correct.

Q.   Did you ask him details of that?

A.   About the --

Q.   The exact words that were used?

A.   No, I can't remember.  I just remember him saying that "we

had gotten consent to search the car, and you can basically search it."

Q.   So you don't know anything about how that was obtained?

A.   No.

Q.   And you don't know what words were said?

A.   That's correct.

Q.   And there was no written consent that you saw?

A.   Not that I know, no.

Q.   Did you ask if there was a written consent?

A.   I didn't, no.

Q.   Did you say, "How did you get it?"  Did you ask him?  Did you say something like that to Officer Perez?

A.   No.  Just when my partner told me that he had got consent to search the car, I just said okay.

Q.   And that was back at the police station?

A.   I can't remember which exact location he got the consent, but he had said --

Q.   No, I'm sorry.  When he told you that he had gotten consent, you were already back at the First District?  When he told you that, not when he got it.

A.   I can't remember exactly.

Q.   Did he tell you when he got the consent?

A.   He had eventually told me on scene that "yeah, we got consent; you can search."

Q.   Did he tell you exactly when he got that consent?  That's

what I'm asking.  Did he get it five minutes after the stop?  10 minutes?

A.    Oh, I can't remember that.

Q.    And you can't remember where he told you that, not where -- what I'm saying is, he said to you at some point "We got consent to search the car."  Where were you when he told you that?

A.    I can't remember if we were on Benning Road when he might have told me.  I'm trying to remember.  But I just remember him telling me that "we got consent; you can search the car."

Q.    And you didn't ask for any details about it?

A.    No.

Q.    And you talked to Mr. Thomas about what to do with the car after he was arrested.  Do you recall that?

A.    I can't remember.  I just remember bringing it back to the First District, just so it's there.

Q.    Do you remember doing a traffic stop on the way while you were still driving the Hummer?

A.    I do remember that, yes.

Q.    All right.  And that was -- were you in front of Officer Perez or behind him?

A.    I can't remember.  I just remember Perez pulled a car over on the way back, and I just assisted him when he pulled the car over.

Q.    Because you didn't have a radio in that car, right, a police radio?

A.    Not a police radio, not like an in-car radio, but one on my person.  I would have had a radio.

Q.    So did Officer Perez tell you he was going to pull over the car in advance?

A.    Either he told me over the radio or he called me.  I can't remember which one.

Q.    Cell phone, you mean?

A.    It would have been, yeah.

Q.    And when you found the gun, Mr. Thomas was in the police station?

A.    He would have been in the police station.

Q.    He wasn't out near the car at all?

A.    No.

        MR. KRAMER:  Thank you.

        THE COURT:  Officer Prendergast, did you run the tags or did Officer Perez on Mr. Thomas's Hummer?

        THE WITNESS:  I can't remember.  I know I was driving. So I'm not sure if I did it or if he typed it in.

        MR. KRAMER:  I'm sorry.  Can I ask him a couple more?

        THE COURT:  Sure.

        BY MR. KRAMER:

Q.    How did you find out that he was Jason Thomas?  Did that occur during this stop, or did you know before?

A.    That was during the stop.  Because he gave me an ID, and it appeared to me that it wasn't him, and doing some more

investigation, we realized he wasn't who he said he was.

Q.   You and Officer Perez had not extensive, but a fair discussion about does it look like him; right?

A.   Yeah.  We wanted to make sure we made the right decision. We didn't want to lock someone up who didn't deserve to be locked up.

Q.   And you certainly wouldn't want to search someplace that somebody had not consented to?

A.   That's correct.

MR. KRAMER:  Thank you.

THE COURT:  Anything else?

MS. VANORE:  No.  Thank you, Officer.

THE WITNESS:  Okay.

THE COURT:  Any other witnesses for the government?

MS. VANORE:  No, your Honor.  At this time -- and the only exhibit I would move into evidence is Government Exhibit 1, which is the body-worn camera.  No other exhibits and no other witnesses.  And the government would rest at this time for purposes of this hearing.

THE COURT:  Okay.  And no objection on Exhibit 1; correct?

MR. KRAMER:  No, your Honor.

THE COURT:  It's admitted.  I think it was admitted already.

What about for purposes of the statements, Mr. Kramer?  Are

you withdrawing that motion, or if not, is the government going to admit the exhibit that is the tape of the confession?  Are you withdrawing that motion entirely?

MR. KRAMER:  We're withdrawing both the Miranda aspect and the involuntariness, but the fruit of the poisonous tree is still there.  I don't think we -- it's up to the government, obviously.  We're not disputing the tape, let me put it that way, or what was said or that it was anything --

THE COURT:  Aside from the fruit of -- the taint, nothing remains of that?

MR. KRAMER:  Yes.

THE COURT:  Anything else, Ms. Vanore?

MS. VANORE:  No.  I mean, I think just as long as the record is clear, my -- the government's understanding is the defense is withdrawing any objection to how the statement was made, how it was taken, that it was made at all, other than that it wouldn't have been made except for this stop.

THE COURT:  Correct, no challenge to voluntariness, no challenge to Miranda.

MR. KRAMER:  That's correct.

THE COURT:  That's mooted out.  The only way it's suppressed is if we find a problem with the search.

MS. VANORE:  Exactly.  So with that understanding, I don't think there's a need to have the exhibit marked -- exhibit moved or to have Detective Wilkinson testify.

THE COURT:  Okay.  Mr. Kramer?

MR. KRAMER:  Do you mind if we take a five-minute break, your Honor?

THE COURT:  No, no problem.

MR. KRAMER:  And we have two brief witnesses.

MS. VANORE:  And your Honor, before we take a break, obviously, I know about the defendant, but I had not been given notice of any other witness.  So if there is any other information relating to that witness as far as impeachment information, I would ask that it be provided.

THE COURT:  So who is this witness?

MR. KRAMER:  It's an investigator in our office who listened to that portion of the tape, including the crucial portion, and it was enhanced, and she listened to it with headphones.  So that's it.

THE COURT:  Are you going to offer the enhanced version, or are we just going to hear her testimony?

MR. KRAMER:  I think I'm going to do both.

THE COURT:  If we have an enhanced version, you could just offer that, and we could all listen to it.

MR. KRAMER:  She also did it with headphones, and I already played it for Officer Perez.

THE COURT:  So that's the tape?

MR. KRAMER:  The audio only, yes.  But she listened to it with headphones, too, to catch the exact wording.

THE COURT:  All right.  Ms. Vanore?

MS. VANORE:  I mean, that's fine.  Again, just for the record, I wasn't aware when that was played for Officer Perez that that was an enhanced version.  I haven't -- I was not provided that prior to this hearing either.

That being said, it appears -- it sounds the same to me.  So I don't have an objection.  I just wanted to, again, request any impeachment information or anything else, because I was not provided notice of this witness before the hearing.

THE COURT:  Okay.  It sounds like there's no impeachment information.  However, both Ms. Vanore and I should have a copy of this enhanced version.

MR. KRAMER:  We can e-mail it.

THE COURT:  I'm having to take this under advisement anyway, but I do want that before I rule.

MR. KRAMER:  All we have is an electronic version.

THE COURT:  That's fine.  Is five minutes enough, Mr. Kramer?

MR. KRAMER:  Yes, your Honor.

(Recess taken from 4:06 p.m. to 4:18 p.m.)

MR. KRAMER:  Your Honor, we would call Rachel Bee.  It's R-a-c-h-e-l and then B-e-e.

RACHEL BEE, WITNESS FOR THE DEFENDANT, SWORN

DIRECT EXAMINATION

BY MR. KRAMER:

Q.    Ms. Bee, can you tell us how you're employed?

A.    I'm employed by the Federal Public Defender in D.C.

Q.    As what?

A.    An investigator.

Q.    And how long has that been?

A.    Three months, about three and a half months.

Q.    Do you have investigator experience before that?

A.    I do.

Q.    What kind and for how long?

A.    Mostly sentencing investigation, mostly in the capital context for the past five years in Virginia, predominantly, and also around the country in other cases.

Q.    Are you also a lawyer?

A.    I am.

Q.    Where did you go to law school?

A.    Berkeley Law.

        MR. KRAMER:  I can't resist, your Honor.  My alum.

    Your Honor, I'm going to play what we had played previously, but just a portion.

    (Audio played.)

        BY MR. KRAMER:

Q.    Ms. Bee, have you heard that before?

A.    I have.

Q.    How did that happen?

A.    I was asked to listen to it by you and Celia.

Q.   Did you listen to it?

A.   Yes.

Q.   How did you do that?

A.   I listened to it several times, a few times regularly on my computer and then again using my noise-canceling headphones.

Q.   Did you also review the -- what's been admitted as Government's Exhibit 1, the body-worn camera that has this episode on it?

A.   Yes.

Q.   You reviewed that, too?

A.   Yes.

Q.   And when you listened to that, what words did you hear?

A.   For the whole clip?

Q.   No, for the little bit after "I went to Chick-fil-A" and --

A.   Okay.  I heard --

         MS. VANORE:  Your Honor, I'm going to object to the relevance of what this witness heard.  We have it on tape.  We have the officer who heard him.  We have the person who said it.  I don't know how this witness's --

         THE COURT:  Mr. Kramer, other than the fact that she wore earphones, noise-canceling earphones, she has no more expertise than any of us to listen to this enhanced tape.

         MR. KRAMER:  I think she can give an opinion on it, though.

         THE COURT:  But she's not an expert.  This is just a

fact issue, and she's -- just as we will listen to it, she will listen to it.  I don't think she has any special expertise in this area.

MR. KRAMER:  Okay.  All right.  I think the Court would want to hear what somebody else who is --

THE COURT:  Maybe I get my own earphones and listen.

MR. KRAMER:  I understand.  And that's fine. Obviously, I want to make an offer of proof.

THE COURT:  Well, I think you may need her -- to the extent that's not already in evidence that she enhanced it, Ms. Vanore, I take it you don't object to her introducing that.

You want that to come into evidence; correct?

MR. KRAMER:  It was actually enhanced by a professional tape enhancement company.

THE COURT:  Okay.  So she can't even lay that foundation.

MR. KRAMER:  No, she does.  She knows who did it.  She has the materials on who did it.  I think I want to make an offer of proof of what she heard for the Court of Appeals, if it ever comes to that.

THE COURT:  Fine.

BY MR. KRAMER:

Q.   What did you hear on the tape?

A.   I heard him say, "Check me; search me; I don't care; I'm good."

MR. KRAMER:  Thank you.

THE COURT:  Any questions?  This is an offer of proof.

MS. VANORE:  Right.  So I guess -- it's not being taken for the truth of the matter.  That's just what she would say, and your Honor sustained the objection.

THE COURT:  Yes.

MS. VANORE:  Then, no, I don't have any questions.

THE COURT:  Mr. Kramer, just to be clear, have I admitted this?  Are you offering that --

MR. KRAMER:  I'm going to call Mr. Thomas, and then I'm going to ask to have all of the exhibits admitted at the end.

THE COURT:  So this witness is excused?

MR. KRAMER:  Yes.

THE COURT:  Thank you.

MR. KRAMER:  And we would call the defendant, your Honor.

JASON THOMAS, WITNESS FOR THE DEFENDANT, SWORN

MR. KRAMER:  Your Honor, we're going to play this clip again.

THE COURT:  Okay.

(Audio played.)

DIRECT EXAMINATION

BY MR. KRAMER:

Q.   What did you say after "you pulled me over" -- after you

said "you pulled me over," what did you say?

A.    I said -- I told him I went to Chick-fil-A, and I was, like, "You can check me, search me; I'm good; I don't care."

Q.    And did you say "me" or "it"?

A.    "Me."

Q.    What did you mean by that?

A.    My body.  I was right there.  I wanted him to be comfortable.

Q.    Did anybody ever ask you about searching the car?

A.    No.

MR. KRAMER:  I have no further questions, your Honor.

CROSS-EXAMINATION

BY MS. VANORE:

Q.    Good afternoon, Mr. Thomas.

A.    Good afternoon.

Q.    Mr. Thomas, you were driving the Hummer that day; correct?

A.    Yes.

Q.    And that's your Hummer?

A.    Yes.

Q.    When you were pulled over, the officers told you it was because of the tags weren't good; is that correct?

A.    No.

MR. KRAMER:  Objection, your Honor; beyond the scope. It was a very limited direct examination, and I don't think you're allowed to go beyond the scope in a hearing like this.

This is not in front of a jury.

THE COURT:  But the Rules of Evidence don't really even apply to a hearing like this, do they?

MR. KRAMER:  But it's also irrelevant.  I asked him -- what they told him he was pulled over for is completely irrelevant.  I asked him a very specific question, what he said and whether he was asked anything, and this is irrelevant to that.

MS. VANORE:  Your Honor, that's no different than if I had asked Mr. Kramer's cross of the officer to be limited only to what I wanted to ask.

THE COURT:  I think I'm going to allow it, Mr. Kramer.

MR. KRAMER:  Do you want me to object to each individual question?

THE COURT:  No, you will have a continuing objection.

BY MS. VANORE:

Q.   The officers informed you that the tag was bad; is that right?

A.   Yes.

Q.   And was that -- were they correct about that?

A.   Yes.

Q.   So your vehicle was not properly registered?

A.   It was just an expired tag.

Q.   And you were never able to give them proper tags that weren't expired; correct?

A.   No.

Q.   You were never able to give them anything to show that the vehicle was properly insured; correct?

A.   I wasn't asked.

Q.   Okay.  Have you ever been pulled over before?

A.   Yes.

Q.   Is your license, registration, and insurance --

         MR. KRAMER:  Your Honor, way outside --

         THE WITNESS:  I was never asked.

         THE COURT:  Ms. Vanore, let's keep it -- you don't need to go far afield.

         BY MS. VANORE:

Q.   You did provide a license, though; is that correct?

A.   Yes.

Q.   And whose license did you provide?

A.   It wasn't me.

Q.   Do you even remember who it was?

A.   No.

Q.   Did you know that it wasn't yours when you gave it to them?

A.   Yes.

Q.   So you knew you were giving bad information to the police?

A.   Yes.

Q.   And did you know that you yourself didn't have a valid license to drive at the time?

A.   Yes.

Q.   So you were untruthful to the police?

A.   Yes.

Q.   And in fact, after you just handed them that license, they then came back and asked you again if that was you; correct?

A.   Yes.

Q.   And you said that it was?

A.   Yes.

Q.   And that was not true?

A.   Yes.

Q.   So you were untruthful to them on more than one occasion?

A.   Yes.

Q.   And you voluntarily got out of your seat to look for other information in the vehicle; is that right?

A.   Yes.

Q.   And you were not able to find any valid information; correct?

A.   Correct.

Q.   Eventually, after the officers had discovered it on their own, you admitted that you were, in fact, Jason Todd Thomas; correct?

A.   I told them before that.

        MR. KRAMER:  I'm sorry.  I think it's a foundation that he doesn't know about.

        THE COURT:  Ask the question again.

        BY MS. VANORE:

Q.   Did you eventually admit to the police that you were Jason

Todd Thomas?

A.   Yes.

Q.   Okay.  And did you do that spontaneously because you had

changed your mind about giving them false information?

A.   Yes.

Q.   It wasn't in response to their repeated questions as to who

you were?

A.   I can't remember, but I remember telling them that I was

Jason Thomas after so long, yes.

Q.   Okay.  And --

         MS. VANORE:  Your Honor, I would ask to set up my

computer again, if I may.  And I'm referring back to

Government's 1.

         BY MS. VANORE:

Q.   Mr. Thomas, I think you've seen this throughout the rest of

the hearing.  I'm going to bring it back up again.  We're in

Government's Exhibit 1, the portion that's marked "Perez 1," and

I'm going to move up to 7.5 minutes into the video.  I'm at

7:32.

     (Video played.)

Q.   Before I turn it back on, Mr. Thomas, you said when you

were speaking with Mr. Kramer that what he played -- he played

you an audio portion of this video; correct?

A.   Yes.

Q.   And you said that what you said was, "Check me; search me; I'm good; I don't care"; is that right?

A.   Yes.  No, I didn't say that.  I think you're trying --

Q.   Tell me again, then.

A.   Let me hear it, and I can tell you.

Q.   You don't recall?

A.   Let me hear it, and I can tell you exactly what I said.

Q.   So without me playing it again, you can't recall the exact wording?

A.   No.

Q.   So I'm going to start it, then, at about -- I apologize for the sirens.  I'm at 7:34.

     (Video played.)

Q.   So what was it you said there?

A.   "Check me; search me; I don't care; I'm good."

Q.   So, "Check me; search me; I don't care; I'm good."

A.   Yes.

Q.   After the officers discovered that you were, in fact, Jason Todd Thomas, they placed you under arrest; correct?

A.   Yes.

Q.   And you understood that they were placing you under arrest because you had an open warrant; is that right?

A.   Yes.

Q.   Were you aware of that warrant at the time?

A.   I wasn't.

Q.    Okay.  But why is it that you gave them a faulty license, then?

A.    Because I know my license was suspended at the time.

Q.    Okay.  So you did know your license was suspended; you just didn't know there was a warrant?

A.    Yes.

Q.    And so after they found that warrant, they placed you under arrest and placed you in handcuffs; is that right?

A.    Yes.

Q.    While they had you in handcuffs, at least one of the officers went into your vehicle and started looking around; isn't that right?

A.    Yes.

Q.    And what, if anything, did you do at that time?

A.    I didn't know what I could do.

Q.    I understand that.  But did you do anything?

A.    No.

Q.    And do you remember talking to the officers about what you should do with the car, since you couldn't take it with you, obviously?

A.    Yes.

Q.    And what do you remember saying to them about what they should do with your vehicle?

A.    I asked could I call someone to come get it.  He was like no, they can't drive it away.  He said he was going to park it

at the station -- he could take it back to the station and park it, you know, and when I get out, I can just get my vehicle.

Q.   Okay.  So did you agree for them to take it back to the station?

A.   I didn't have a choice.

Q.   That wasn't my question.  Did you agree for them to take it back to the station?

A.   Yes.

Q.   Okay.  And they did, in fact, tell you that they -- well, you said yourself, they were going to park it around the block; correct?

A.   Correct.

Q.   And then they said they could do that, or they could take it back to the station?

A.   No, they never said they can park it around the block.

Q.   I think we're going to have to pull up that video again. So I'm still in Government's 1, Perez 1, and I'm going to move it up to 16 minutes.

     (Video played.)

Q.   It restarted at the beginning, but I'm going to go to, as I said, 16.

     (Video played.)

Q.   So stopping right there, I'm at 16:17.  Am I correct that the first thing Officer Prendergast said was, "We're going to have to park it"?

A.    Yes.  He said, "We're going to have to park it."

Q.    I'm going to start up again at 16:17.

      (Video played.)

Q.    And I'm going to stop at 16:30.  You just asked where they were going to park it; is that right?

A.    Yes.

      (Video played.)

Q.    And now I've stopped at 16:32.  Am I correct that Officer Prendergast said, "We're going to park it around the block"?  I'm happy to play it back.

A.    Yeah.

Q.    I will play the whole thing so you can hear it all together.  I'm starting at 16:24.

      (Video played.)

Q.    Does that refresh your recollection about that conversation?

A.    Yes.

Q.    So they did say they were going to park it around the block or could take it back to the station; correct?

A.    Yes.

Q.    And fair to say you nod when they say take it back to the station?

A.    I don't remember if I nodded or not, but I had no options.

Q.    That's not what I'm asking.  I'm asking what the officers told you, which is that, "We're going to park it around the

block, or we can take it back to the station"; correct?

A.   Yeah, that's what he told me.

Q.   Okay.  So they did give you two options?

A.   I didn't have an option.

Q.   All right.  I played the video correctly, though; right?

A.   Yes.

Q.   In fact, I'm going to keep playing it a little bit more here.

(Video played.)

Q.   All right.  And then the officer asked you if the keys were in the ignition; correct?

A.   He didn't ask me.

Q.   That's what he said.

A.   Okay.  I heard that, yes.

Q.   And while you were standing there, did the officers go into your vehicle?

A.   Yeah.  He just pulled out some Chick-fil-A.

Q.   Yes, I see that.  I'm not going to play the whole tape again.  But do you recall seeing them go into your vehicle after that, too?

A.   Yes.

Q.   And did you say anything to them at that time?

A.   I didn't know I could.

Q.   You spoke with a detective later on that day; is that correct?

A.    Yes.

Q.    Did you say anything to him at that time?

A.    Yes.

Q.    Okay.  I should have clarified.  Did you say anything to him about these officers going in your vehicle?

A.    No, because I didn't know who went in what.

            MS. VANORE:  Okay.  Thank you.  I don't have anything further.

            THE COURT:  Any redirect?

                    REDIRECT EXAMINATION

            BY MR. KRAMER:

Q.    Did you think you could tell them whether they could look in the car or not?

A.    No.

Q.    Did you think you had any choice?

A.    I didn't.

Q.    And had you ever been asked if they could --

A.    No.

Q.    -- search the car?

A.    No.

            MR. KRAMER:  No further questions, your Honor.

        (End of excerpted transcript.)

CERTIFICATE OF OFFICIAL COURT REPORTER


          I, Sara A. Wick, certify that the foregoing is a

correct transcript excerpt from the record of proceedings in the

above-entitled matter.




/s/ Sara A. Wick                    July 27, 2018

SIGNATURE OF COURT REPORTER         DATE